Madam Clerk, would you call the first case and the only case I believe? The one and only. Deputy 1378, Illinois Insurance Guaranty Fund v. Chicago Carriage Cab Corporation. Good morning. Will the attorneys who intend to argue this morning step forward and state your names clearly and spell them for the record. Jeff Scalero, S-C-O-L-A-R-O, for Chicago Carriage Cab, the appellant. Good morning. Brian Schuman, S-C-H-U-M-A-N-N, for Illinois Insurance Guaranty Fund. Thank you very much. You typically allot 15 and 15. Would you wish to reserve any time for rebuttal? I would wish to reserve violence for rebuttal. Very well. Then we can proceed when you're ready. Thank you, Justice. May it please the Court, Counsel. Justices, we are here today because Chicago Carriage seeks the reversal of the trial court's decision granting summary judgment in favor of the fund and declaring that coverage does not apply to this particular incident, the underlying incident in the case. The court's decision here, I believe, and the issues raised on this appeal will have a serious impact on the custom and practice of the case. How is that? Your Honor, the current system for providing insurance to cabs in the city is governed by what is called, what is City Rule TX302, and that's the change of equipment policy in the city. The change of equipment policy follows a specific pattern, a specific set timeline, and that is the change of equipment is applied to a new vehicle. That vehicle is painted and it's bought and it's placed in the yard. You then have to make an appointment with the Chicago Department of Business Affairs and Consumer Protection, the BACP. BACP is what I call it in our briefs. You have to schedule that inspection certification before that vehicle ever gets approved. You know, that procedure we saw in there, but wouldn't it make more sense if that was actually part of the agreement to put that in writing? Potentially, Justice. My understanding is that we have seen no agreement where that is papered in such a fashion. I also don't know, even if it was papered, how the endorsement process would be any different. You would still need to change coverage from one vehicle to another, and under the current policy you at least have to do that three days before the vehicle ever goes to that BACP for the inspection and for the change of medallion. So at the very minimum, there's a three-day gap in coverage for nearly every taxi in the city right now. And so that's why I believe it would be an impact industry-wide, but also an impact on the public at large, given the fact that if there's a portion of cabs out there, let's say it's 10%, maybe it's 20%, I'm not sure. But if it's 20%, that's one in five cabs that's driving around without insurance coverage. I mean, there's no way around that? I mean, isn't there a way to contract with insurance to make certain that there is at least, I don't know, I'll call it this for lack of a better word, some kind of gap coverage? Right, Your Honor. As far as potentially papering the thing, I think that that is something that could have been done. I'm not sure, again, how that would work in practice, because there still has to be a process by which the insurer understands when a new vehicle has been placed into service. And currently, that's done via the hard card, which is the card that's issued at the BACP at the inspection certification. So even if it's papered, again, I think that there's, by necessity, there is still going to be some type of gap coverage there by the fact that the endorsement will happen prior to the vehicle getting to the BACP. In other words, Justice, I think that there's always going to be the potential, even if, let's say, the old vehicle sits in the lot for three days. Let's say they did that. The new vehicle still has to get there to the BACP. And I think that even under that scenario, there would still be gap coverage from the lot to the inspection. So you mean that the old vehicle simply, or the new vehicle, the new vehicle simply couldn't remain stored with the association while the old vehicle then is transferred? So currently, how it in practice happens, Justice, is that the new vehicle drives with the medallion essentially in the passenger seat, and then it's affixed when it gets to the BACP for that certification and that inspection process. Here's the problem that I'm working with. Today, we're talking about taxi cabs, and you have a specific provision saying this is not insured. Next month, I might get a case where we're talking about real estate. And, you know, when we decide these cases, it goes to every type of case. So we get one next week, and it says hotel is not covered. And what about this taxi cab case? It is, because we had a procedure. And I think the difference here, Justice, and I appreciate your point, is that there is this regulation that we're bound by. The city of Chicago regulates these in a manner that they don't necessarily with real estate. And that's sort of the dichotomy right now in the argument between Uber and cabs and all the rest, the heavy regulations that the cabs are under. And so even if I think the scenario would have to be factually exact for there to be some sort of application to other cases, and I don't know that you can create this scenario without having the same city regulations that apply. So the city is aware of this coverage issue, and the industry has not taken any steps to have the city address this lack of coverage? The city would potentially invite liability by simply closing its eyes to the absence of coverage? They have made it as far with the city as they have with regard to the Uber issue. This just hasn't been modified. The policies have not been changed. This issue, I believe, has been addressed by other brokers and taxi cabs. It's just never gained any traction with the legislature or the city of Chicago council, whomever might be the person to bring that to the attention of. So the city is aware that there is Uber coverage? Yes. How do we get around Endorsement 11? Endorsement 11, we get around it because I think you have to take the policy and the coverage for which it was written. And I think that that is why we cite the Crum case, and we talk about how the parties contract for the risks undertaken and purchased, and the subject matter that is insured and the purposes of the entire contract. If we say that Endorsement 11 in the four corners of the four corners argument, if you want to call it that, and as a minor point, I do think that they didn't cite any authority for the four corners provision. But nonetheless, the — But it is a part of the contract. It is a part of the contract. So do they have to cite any authority for it because it is a part of the contract? I said it doesn't cite justice. I'm not going to hang my hat on that one. All right. And so the endorsement isn't definitely part of it. But if we construe Endorsement 11 to mean to deny coverage in this particular instance, that means that Chicago Carriage essentially paid $5 million for nothing, which is the premium they paid that year for coverage of the 813 vehicles. And so I just think you have to consider it in its totality, both with the City of Chicago regulations, the money that was paid, an exorbitant amount of money, it's an extreme amount of premium to run a business, and look at that in its totality for what the risks that were covered. Additionally, ULICO did pick this case up until they were liquidated. And in my motion to reconsider, I also included evidence of another instance that was very similar, that was actually exactly similar with Endorsement 11. And there was coverage, we believe, applied to that. The Illinois Insurance Guarantee Fund has not notified us, as I say in my brief, that there isn't coverage on that particular vehicle. Perhaps me saying this right now will cause them to, but that's how I would. I would rather think that what would be caused, regardless of how this case comes out, I can't believe that there isn't some notice to the industry that this is an issue now squarely before the court. I would like to think that, you know, rather than the funds altering or attempting to modify the parameters of its coverage, that there would be some opportunity for the industry to really press with the city to close this gap. Justice, I totally agree with you. I think that that's something, because right now, my Chicago carriage still does the same practice. McLuhan Associates is the broker in this case. They write for numerous other cabs, a couple of which signed affidavits upon the court's ruling, and the underlying trial court's ruling. And so I think that it's absolutely correct that there has to be some sort of industry notification or some sort of notice to the city that this needs to change. Quite honestly, Judge Taylor afterwards, after the whole thing, asked if there was a procedure himself to see, like, is there something that we can do about this? Because he was also similarly bothered, as I think the panel might be, that this exists. You know, that there is this potential for argument that there are all these cabs out there that don't have coverage for a certain period of time. It's really a concern. And I know it's a concern for Chicago Carriage. It's a concern for McLuhan Associates. And they haven't found a way around it yet, because the managing general agent for these contracts, for these insurers, really controls how things are done and how the policies are written. And they have little power, the brokers themselves, to sort of modify that language. They're sort of stuck with the premium that they're quoted, and that's really it. And so I think that that's, whatever happens with this case, I think that for sure there needs to be some type of message, both to the industry and to the city, that this policy needs to change in some regard. Justice, I also mentioned in my brief that there's also the argument of mutual mistake effect. And I think that that, and I focus on number three, which is the third prong of the test. I don't think that there's a dispute that there's an agreement between the parties in writing. So that covers one and two. Number three is the variance. And I think it's really indicative of the variance between the agreement and the writing that the endorsement is what's called a no-money endorsement. So they're not paying any additional money for the endorsement, right? Most typical insurance policies would alter the premium or would alter the monthly basis on which they're paying based on the risk that is out there. The insurance company is considering it the same risk because the vehicle is one-for-one. And therefore, it's a no-money endorsement. So it's not, it is a variance from the policy in the sense that the policy is changing, but there's no money changing hands. And so I think that that, if you consider the carrier and you consider, and this was something that Judge Taylor had asked me about, how does the carrier ultimately know when the changeover happens? And I showed some correspondence in response to that that indicates that if there's an accident, there's a hard card then sent to the carrier. And that's a modification, too, and a variance from the policy because they're then honoring that coverage for a different vehicle that was essentially not there in the first place or not covered in the first place, technically. So that's a modification from the endorsement to the hard card. And then again, we're talking about an industry practice that is, you know, unique to this industry and unique to the carriers, but has obviously consequences of its own. And so we also... So are you suggesting that there actually was some kind of a meeting of the minds? I am, Judge. Because I think it is clear from ULICO's acceptance of the case, and no reservation of rights, no denial of coverage, they had full intention to defend this very case. And so I think that that is a meeting of the minds and a change in the contract. If you were to take the Four Corners argument, the endorsement itself, ULICO's operating by a different set of facts, a meeting of the minds, separate and apart from what's in the contract. The affidavit you submitted in response to the motion, is there anything in that affidavit which says that we intended to make this part of the written contract? Justice, I don't think that there's an intention. Really, there was no intention, as far as I know, to make it part of the written contract. It was simply that when an incident occurs, they send over the hard card to show when coverage would trigger. And therefore, that was their operating procedure. They didn't see a need to change the...to make a modification, if that makes sense. They didn't see the need because they were operating under this procedure for years and years, where if there was some type of incident between the notification to the BACP and the changeover to the new car, if there was an incident, it was covered. So to them, there was no need for a modification in that regard. And then lastly, Justices, I also brought to the attention of the ICC's, or the IGF, the Illinois Insurance Guarantee Fund's actions in this case. They did send an initial reservation of rights there. We're not disputing that. But that was formulated. They had to...they had not obtained the policy. In fact, they don't obtain the policy for over a year later. In that time, they file an appearance. We think they're defending the case. We have no reason to start negotiating with the underlying plaintiff. The case is still pending, isn't it? The case is stayed, yes. But the landscape has changed since then. Mr. Carrington was in a coma for a period of time. And while the case was stayed, he then passed away. That changes, I think, the dynamic of what settlement might have...what settlement discussions might have undertaken. And, you know, the year-long delay, I think there's... that the Illinois Insurance Guarantee Fund's express purpose is to avoid excessive delay in payment. And here we have a situation where I think you could certainly call it a year of passing and Mr. Carrington passing an excessive delay in payment. But they were clear that it was their intent to further study or investigate. There was no dispute that they were trying to determine whether or not they could in fact fend. Yes, Your Honor. But at some point it becomes detrimental to rely on them filing an appearance, them defending the case, them working the case up, where we could have had the opportunity to hire our own counsel to move the case along. We could have taken his deposition or tried to take his deposition or we could have known that there was no opportunity to take his deposition. We could have...if they hired...let's say they hired me. I could have gone out and tried to find witnesses to the case. And now this accident happened in 2011. It's going to be really difficult to find witnesses for a car accident that happened some seven years ago now. And so I think we're prejudiced in that regard. Otherwise, they're affording me to be here. They would have paid somebody to be watching this thing more closely and taking further actions to defend themselves. Thank you. Mr. Sklar, you want to begin to wrap your argument? In closing, Justices, I think what we spent the most time on is really the most important, and that is the industry effect of this case and the industry practices and the city regulations. I think that this...what happens with this case will certainly have an impact industry-wide. It may trigger the denial of coverage for many other cases in which there was an incident that had a gap in coverage or occurred during this quote-unquote gap in coverage. And so I think that that's the lens in which I would ask the Justices to look at this case, that it's something that needs to be done about the city policy, which we believe hamstrings the cab companies and puts them in a position where they have no choice but to follow those regulations or be told they can't operate on the streets. And they're very much struggling right now to even operate in the face of Uber, much less these regulations that are potentially denying coverage for premium that they paid $5 million for or more. I'm sure it is today. And so I think that the Justices would...I would ask that the Justices look at the case in that regard. I also think that there is, taking into totality, there's case law to support that, and I think that we're here because there is this significant risk to the industry. I also think there was a mistake in fact. I think that the no-money endorsement is evidence of that. I think the policy under which that we now know that they send...that there's an accident, there's a hard card sent over, that's the coverage that applies. Unico itself had defended this case. And so, you know, and then I think the underlying timeline with respect to the carriers... I'm sorry, the guarantee funds actions runs contrary to the statute, which is to avoid excessive delay in payment. The date of the accident was October 5, 2011. First reservation of rights, June of 2013. First denial of coverage, May of the following year. And I think that during that time, Chicago Carriage would have taken steps to protect itself and protect its business, and now it faces what could be seven figures in liability and potentially close the business. They're the marine cabs you see driving all around Chicago. You know, I took one today, and it runs the potential, given everything we're facing with the financial difficulties and the over-regulation of the city of Chicago, that this could ruin and put the business out of business. And so that's the lens under which I would ask this panel to look at this, and I appreciate the court's time. Thank you very much. Thank you, sir. Mr. Shuman. Mr. Shuman. Thank you. As Your Honor correctly suggested, this is a contract matter. It's unfortunate that Chicago Carriage is putting taxis out on the street without confirming that there's coverage. The suggestion, frankly, that it somehow doesn't know how to fix that I find a little surprising. It's quite simple. You don't put a cab on the street until you confirm that there's coverage. If you're switching the cars out, that's what you do. I don't know how much simpler it could be. The starting point for this analysis is the admission of Chicago Carriage Cab, key admission, that the endorsement number 11, which indicates that insurance coverage for the Crown Victoria, the subject car, was transferred on September 22nd. That's their brief at page 15. Their argument keeps ricocheting back and forth between this idea that somehow the regulations and the customer practice and whatever else may go on in the industry somehow controls the contract. Nothing controls the contract but the terms of the contract. What they're arguing is that they have a way of doing business and that had the insurance company not gone belly up, this claim would have been covered. It's just you, a third party, steps in and you go what's literally there when the customer usage was something totally different. And that's the way of doing business with their company and others as well. Well, a couple of responses. First of all, let's assume that that's true. The Santucci case is dispositive of that because that would be an argument for the basis of waiver or estoppel vis-a-vis the original insolvent insurer, Ulica. The Illinois law is clear. The Illinois Insurance Guarantee Fund cannot be estopped and cannot waive anything based upon the conduct of the underlying insolvent insurer. But more importantly, that argument doesn't have any factual basis whatsoever anyway because according to them, this is where the argument to me just gets confusing. On the one hand, they want to argue, they admit that the contract, Endorsement 11, does expressly and unequivocally transfer coverage from the subject car before the accident. What about the mutual mistake? That's what I'm getting to you on. So the argument is, on the one hand, they admit that coverage doesn't exist but they want to argue that there's a mutual mistake of fact for which the contract should be reformed. Okay, where's the evidence? They didn't offer us until the evidence. The affidavits don't support this argument whatsoever, as you correctly suggested. Take a look at the affidavit. There's no evidentiary support whatsoever that the real meaning of the mines, that the quote, real agreement, had anything to do with this story about how Ulica supposedly understood that cars would be on the road and covered even though the endorsement, you know, the language of the contract, which is the only thing that we can look to, expressly and unequivocally says, it's not covered by Vernon McBishop. Furthermore, even if that had any semblance of factual reality, they've, what's the term, ratified, excuse me, they've ratified this contract no less than 11 different times. How? Each time there's a change of coverage from an old car to a new car, they receive an endorsement, such as endorsement 11, that's the 11th of 11 plus endorsements, specifically saying new cars off, old cars off coverage, new cars on coverage. Every time they receive that, they get the endorsement, they get emails from the broker, and they get certificates of insurance. And it was admitted by the room 206A1 corporate representative that they received all of that with respect to endorsement 11. So 11 times they purportedly receive these new contract endorsements. By the way, there's an innovation clause that says the policy can only be modified, can only be changed by written change. And they do nothing. They don't ever call up and say, hey, you know what? These endorsements conflict with our understanding of the meeting of the minds and the agreement that we supposedly have with an old car. Our understanding is that we're going to have coverage for these cars even though we have this change endorsement which says coverage is gone. We're going to ignore that because the real agreement, as we understand it, is completely different. Why don't they ever call up and say that? That's how they've ratified it. No less than 11 different times, even if that had any basis in fact whatsoever. The room 206A1 deponent admitted repeatedly they received the endorsements, they received the emails from the broker, they received the certificates of insurance from the broker, expressly advising that this car was no longer covered. They do nothing except they come in with a story after it's all over, and retroactively try to come up with a reformation argument for which they offer the court nothing. Nothing. Look at the affidavits. So even if that argument had any merit, this is based on evidence, Your Honor, of course, they've got to proffer something. They proffered nothing. And furthermore, their own corporate representative repeatedly admitted that they had no evidence to support reformation or waiver or estoppel. Now, Santucci speaks, as a matter of law, to any potential waiver or estoppel based upon ULICO. Based upon the alleged conduct of the fund itself, this is where the fund, of course, differs from ordinary insurance companies. Even based on ordinary insurance, as a matter of law, there could be no factual issue for waiver or estoppel because, first of all, their own corporate representative admitted he had none, and as a matter of law, the undisputed facts show the case was stayed. So there's no mention of full reservation of rights letters. The evidence proffered by the fund shows they were repeatedly trying to get... Why was the first letter so nonspecific? I mean, don't you have to be fairly specific when you are asserting your reservation of rights? I mean, this seemed like... I have three. Maybe there were four letters. I have three letters. But the first one seemed like it was so very general. Yes. How would that put them on notice, really? Well, even if it didn't, this is where the fund differs from an ordinary insurance company. The fund doesn't get anything from the liquidator right away, right? It's scrambling to get files. It's been scrambling for months to try to get a copy of the policy. The day after it got the policy, it issued a specific, its fourth reservation of rights. The first one, also, if you look at it, right, it points out that we, the fund, are not doing anything in terms of investigation until you, CCC, comply with certain mandatory prerequisites, such as the net worth affidavit. They have to come in and show they're worth more than $25 million, or most other prerequisites. So the fund issues a general reservation of rights letter based upon its statutory obligation to come in and start to address and potentially investigate a claim  But until that happens, they don't have any duty to investigate. They're not a regular insurance company. So the first reservation of rights letter points out, we're just putting you on notice that we've received this from the liquidator. We're not investigating anything until you comply with the prerequisites, such as the net worth affidavit. That didn't occur until a month later. They issue a second reservation of rights letter, and then they specifically start investigating to find the policy. So under any substantial scenario, what else could they do? But they've already admitted that there's no basis for prejudice, for detrimental reliance, no basis whatsoever to support any of that. In the Santucci case, it's a matter of law of foreclosures, any conduct based upon Uruco. So this is one of the distinctions I take between regular, quote-unquote, insurance companies and the fund coming into play. They have nothing in the record to support their claim. And Reformation is completely inconsistent with their admission that there's no coverage under the policy. So I don't know, their argument makes no sense to me, frankly. They come in basically saying, oh, this is going to have a huge impact on the industry. I don't know why. Chicago is fully aware of the error, so don't put a can on the street. I don't know what the problem is. Make sure you have coverage, and if you want to negotiate a different system with your current insurer on how you do that, fine, but you don't get to rewrite the contract unless you can show Reformation, and they have zero evidence in any of their affidavits to support that. So it's no surprise that Judge Taylor ruled specifically the way he did. He made four specific rulings in the Sotomayor judgment. Number one, there's no coverage on the subject vehicle. They admit that. Number two, it says that there's no legal or factual support for the argument that there was a mutual mistake of fact. There's nothing proper. Number three, as to waiver or stop, the statute forecloses any arguments regarding the conduct of the underlying insurer, and number four, with respect to the guarantee fund, based on this record, of which there's nothing in it, proffered by the CCC, there's no waiver or stop law. Therefore, it makes no difference. There's no fact issue here, Your Honor. Thank you. Thank you, Mr. Schumer. Mr. Scalaro. Thank you, Justices. First, taking counsel's reformation argument, he notes in the underlying oral argument at C984, what is page 26 of the oral argument, that he did not raise that issue. He says, again, this is a point I did not raise in my brief. I'm happy to brief it, Your Honor, if we want to talk. He's offering the court the opportunity to have us brief the reformation argument. The court declines to take him up on that offer. So I think for him to make that argument here is improper. But I also think that for him to suggest that we have offered no evidence of how the contract is done in practicality, is also disingenuous. The affidavit of Brandy Allen, who's actually in the room today, states that I believe the aforementioned, it's number two and three of her affidavit, and it's C1000 through C1009. And she attaches a specific instance in how another incident occurred out of this endorsement 11, and she talks about how in practicality this worked. And she demonstrates emails from the carrier saying, I don't know, can you send me the hard card on this? I've got to figure out when the hard card was transferred. And based on that, there was coverage applied to that case. And so I think it's incorrect to suggest that we've offered nothing regarding how this is done in practice. Was that submitted at the original hearing? That was at the motion to reconsider. And I also, at the motion to reconsider, Justices, I also noticed that Judge Taylor, who I have the utmost respect for, and I think he's a great judge, but I think he got it wrong here. And he says on R58, which is the end of the oral argument on the motion to reconsider, when talking about the affidavits, he says, I agree with Mr. Schuman that it's not relevant for the purposes of interpreting this contract. So on that basis, I will deny the motion. And I think to say that these affidavits are not relevant, it really is an attempt to overlook how things were done and why they were done, including the City of Chicago regulations, the insurance companies' actual actions with regard to practice, the putting these policies in practice, and the way the taxicabs operated. Counsel asked, why didn't they say anything? Why didn't they say that this is different from our interpretation of the contract? Well, they had no reason to say anything. These claims were covered. It would be really rude, I think, for a taxicab guy to call his carrier and say, this writing is a little different from what we were understanding. I just don't think something like that would ever happen. And so I think that that's why there was no communication or that's why there's no need for it. The claims were covered and they were free to do business as usual. And so in closing, I really, again, I would ask the justices to look at this case through the lens in which it would have application throughout the city. I do agree with Justice Cobbs that this is something that should be looked at industry-wide, both from the standpoint of the carriers, from the standpoint of the taxicabs, and most importantly, from the city of Chicago. And so going forward, I think there certainly needs to be some sort of examination of this, and I think that the justices could write an opinion that would both protect the interests of Mr. Carrington, which would be to have coverage and not have a bankrupt defendant, and also to send a message to the city of Chicago that they need to examine their policies and procedures in this regard. And so I would ask the justices to look at that, and I think you offered your time. Thank you very much. Thank you. Thank you, Counsel. We appreciate your argument this morning. The matter will be taken under advisement and a disposition issued in due course. Thank you very much. Thank you, Justice.